**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**IN THE MATTER OF THE COMPLAINT OF**    **CIVIL ACTION**
**MNM BOATS, INC., ETC.**

                    **07-1938**

                    **SECTION: "C" (4)**

**ORDER AND REASONS**

This matter was tried before the Court, without a jury, on September 28-30, 2009, and taken under advisement. Having considered the evidence and testimony adduced at trial, the record, the memoranda of counsel and the law, the Court now issues its opinion.

**I.  BACKGROUND**

The following facts are undisputed.

On January 20th, 2007, between 7:00 and 7:30 a.m., the F/V MASTER DUSTIN I ("the DUSTIN"), a shrimping vessel owned by Thu Van Nguyen and insured by G&M Marine, Inc., and the M/V MS. WHITNEY ("the WHITNEY"), owned and operated by MNM Boats, Inc., struck one another in a starboard to starboard collision.

Following the collision, the WHITNEY traveled to Calcasieu, Louisiana, for repairs in the Bollinger Shipyard.  The DUSTIN traveled to Port Arthur, Texas, initially, and then to Jemison Marine in Alabama to get dry-docked.  Mel Guidroz, safety coordinator for MNM Boats, called Robbie Benoit, an MNM employee, to ask him to meet the DUSTIN at the dock and assess the damage.  Benoit took photographs of the damage to the DUSTIN.  He also boarded the DUSTIN and made a sketch of the vessel's course recorder.  (Exh. 1).  At trial both parties stipulated that Benoit's

1

sketch of the course recorder is the best evidence available of the DUSTIN's path in the time period immediately before and after the collision.


## II. FINDINGS of FACT and CONCLUSIONS OF LAW

The Court heard testimony from seven witnesses: Thu Van Nguyen, Rose Nguyen, Christopher Collier, William Courtenay, Melvin Guidroz, and Robert Badeaux for the G&M Boats and Thu Van Ngyuen; and Tim Anselmi for MNM Boats. Based on the testimony of these witnesses, and the numerous exhibits[1] and depositions received at trial, the Court makes the following findings of fact and conclusions of law.

*A. Limitation Action*

This is an action filed pursuant to the Shipowners' Limitation of Liability Act, 46 U.S.C. § 30505, *et seq.* Jurisdiction is proper in this Court pursuant to its admiralty and maritime jurisdiction, 28 U.S.C. § 1333. This matter involves an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

MNM Boats filed this action for exoneration from or limitation of liability pursuant to the Shipowner's Limitation of Liability Act, 46 U.S.C. § 30505, *et seq.* The Court having found as a fact, *infra*, that the WHITNEY was at fault in causing the January 20, 2007, collision finds that MNM is not entitled to exoneration. However, the Limitation of Liability Act "allows for limitation of liability when the vessel owner has no privity in knowledge of the acts which caused the

---

[1] A Coast Guard Investigation Report was submitted as evidence. However, the Court deliberately did not review the Coast Guard report, which is inadmissible under 46 U.S.C. § 6308. Although the parties expressed concern that the experts who testified may have relied on the Coast Guard report to some extent, the Court finds that there was sufficient evidence, primarily the Kent deposition, to support the findings discussed below.

damages." 46 U.S.C. § 30505. "Once a claimant proves the negligence or unseaworthiness caused an accident, an owner seeking limitation must show that it lacked privity of knowledge of the condition." *In re Kristie Leigh Enterprises, Inc.*, 72 F.3d 479, 481 (5th Cir. 1996). Because the corporation operates through individuals, the privity and knowledge of the individuals at a certain level of responsibility must be deemed the privity in knowledge of the organization, 'or else it would always be able to limit its liability.'" *Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1376 (5th Cir. 1983) (quoting *Coryell v. Phipps*, 317 U.S. 406, 410-11 (1943)). A corporation is charged with the knowledge of any of its managing agents who have authority over the sphere of activities in question. *In re: Kristie Leigh Enterprises, Inc.*, 72 F.3d at 481.

Mistakes of navigation are not usually attributable to the ship owner for purposes of determining privity and knowledge. *In re Kristie Leigh Enterprises, Inc.*, 72 F.3d at 481. The Court holds that MNM lacked privity and knowledge over the mistakes in navigation made by Captain Kent. Therefore, while not entitled to exoneration from liability, MNM is entitled to limitation. However since the Court finds that the damages sustained by the DUSTIN's interests do not exceed the value of the WHITNEY, limitation is moot. (See Rec. Doc. 1, establishing the value of the WHITNEY at $1,353,070.06).

*B. Liability*

<u>i. Findings of Fact</u>

Prior to the collision, the DUSTIN, captained by Ba Nguyen, was trawling for shrimp, with its nets in the water, at a speed of two to three knots. (Exh. 6 at 2; Exh. 16 at 5) The vessel had been trawling for at least six to seven hours. (Exh. 6; Exh. 16). Captain Nguyen was sleeping (Exh. 16

at 2-3), while crewman Si Do[2] was piloting the vessel and crewman Ly Le was watching television in the galley. (Exh. 16 at 3; Exh. 17 at 2). Shrimp boats, when trawling, tend to navigate in a "grid" pattern, (Testimony of G&M marine navigation expert Robert Badeaux) especially "when they're catching shrimp." (Testimony of Melvin Guidroz). This means that when a shrimper finds an area with shrimp, he will repeatedly trawl through that area, back and forth. (Testimony of Robert Badeaux). In this case, the DUSTIN was making alternating passes from south to north and then north to south within a confined, though not precisely defined, latitudinal range, moving at a speed of 2 to 3 knots. *Id.* While trawling, shrimping vessels dragging nets also have restricted maneuverability. (Testimony of MNM expert Tim Anselmi). Because shrimp boats are "all across the coast" (Testimony of Melvin Guidroz), experienced captains know to be "on the lookout" for them because "you are never going to know exactly how they are going to trawl." (Testimony of Robert Badeaux).

The WHITNEY, an offshore supply vessel approximately twice the size and weight of the DUSTIN (Exh. 7, 10) and captained by Jerry Kent ("Kent"), was en route to Cameron, Louisiana, at a speed of 11 to 12 knots. (Exh. 48). Kent had worked an extended shift on January 19th, and was also taking prescription medications that caused drowsiness. (Kent Deposition at 86). Although Able-body ("AB") Roberto Reyes was the assigned lookout for this shift, he had left the wheelhouse to "make his round and get something to drink" and was not acting as a lookout at the time of the collision. *Id.* at 63. Kent was therefore alone in the wheelhouse in violation of § 7.14 of C&G

---

[2] This individual was alternately referred to by the parties as "Do Si" and "Si Do." In the interest of consistency, the court adopts the latter the purposes of this litigation.

Boats, Inc.'s[3] Safety Manual. (Exh. 8 at 20).

Sometime prior to the collision, Kent noticed the DUSTIN. He assumed the DUSTIN was in fact trawling and knew he needed to change course to be certain to avoid any contact with the shrimp boat. (Kent Deposition at 4, 119, 161). Kent adjusted the WHITNEY's autopilot navigation, turning it three degrees from 299 to 302. *Id.* at 117. In his deposition, Kent testified that when he first saw the DUSTIN, it was about 3.5 miles away. *Id.* at 56. By the Court's calculations, this would have been approximately 16 minutes prior to the collision, assuming the WHITNEY was traveling at 11.5 knots.[4] By his own admission, given the speed of the vessels, three degrees was a "pretty small change." *Id.* at 117. Kent also acknowledged that the DUSTIN as a fishing vessel had limited mobility. *Id.* at 119.

"Seven minutes or so" later, Kent noticed that the DUSTIN had changed course, and that the two vessels were once again on a collision course. *Id.* at 143. Kent adjusted the autopilot back three degrees, to the original course of 299. *Id.* Kent then "nodded off" for an undeterminable amount of time, awaking to find the DUSTIN a "boat's length" in front of him. *Id.* at 47, 54.

Neither party was able to locate the crew of the DUSTIN to testify in this matter. Statements from Captain Ba Nguyen and crew member Ly Le were admitted as exhibits and not objected to. (Exh. 16, 17). The transcript of settlement between Si Do and G&M is the only available testimony by Si Do, but does not meet any of the hearsay exceptions. (Exh. 27). Both Ba Nguyen and Ly Le stated that Si Do was in the wheelhouse when the collision occurred. (Exh. 16 at 3; Exh. 17 at 2).

---

[3] C&G is MNM's parent company (Testimony of Melvin Guidroz).

[4] This also assumes the DUSTIN was stationary, which it was not. However, it was trawling at only 2-3 knots and was not approaching the WHITNEY head on, so the Court will use 16 minutes as a rough estimate.

Ly Le stated that Si Do pulled in the try net shortly before the collision but was back at the wheel no less than five to ten minutes before the collision.[5]  (Exh. 17 at 7).  Le also testified that immediately before the collision Si Do called out a warning, at which Le ran up to the deck and saw the WHITNEY "coming very close."  (Exh. 17 at 2).  However, there is no available admissible evidence to establish at what point Si Do became aware of the WHITNEY's approach, or whether he took any actions to avert the collision.

Based on Benoit's sketch, the DUSTIN's course recorder showed that the DUSTIN had been in the process of a lengthy turn from north to south when the collision occurred.  (Exh. 1).  This was a typical pattern for a shrimping vessel to trawl.  (Testimony of Robert Badeaux).  MNM expert Tim Anselmi testified at trial that based on his experience with course recorders and his assessment of the amount of time it would take to execute particular turns shown on the recorder, the DUSTIN began its turn approximately two hours prior to the collision.  Benoit testified that east-west line on the exhibit was a quarter of a mile to two miles in length.  (Benoit Deposition at 95).  Assuming that the larger two mile estimate is most accurate, and given that the DUSTIN was traveling at 2 to 3 knots, two hours is a reasonable estimate for the amount of time for the DUSTIN to complete the entire turn, consistent with Anselmi's testimony.[6]  The Court therefore finds these estimates

---

[5]  The parties disagree about the relevance of this act.  Thu Van Nguyen points to a photograph of the DUSTIN that he argues demonstrates that the winch controls and try net are in close proximity, so pulling in the net would not limit Si Do's view of oncoming vessels.  (Rec. Doc. 156 at 4).  MNM implies that the controls in the photograph are "stern" controls.  (Rec. Doc. 158 at 10).  From the evidence presented, the Court cannot determine the layout of the DUSTIN.  Regardless, ten minutes prior to the collision was an adequate amount of time prior to the collision for Si Do have seen the WHITNEY in ample time.

[6]  The turn as depicted is not a perfect semicircle, which would only be about 3.14 miles if the east-west line is two miles.  Instead, it is more ovular, extending further north before swinging south than would be seen with a circular path.

credible.[7]

There is insufficient evidence for the Court to make any factual findings regarding radio communications or other inter-vessel warnings prior to the collision.

Although there is no evidence about the exact circumstances aboard the DUSTIN, it is clear that its options were extremely limited. A trawling shrimper moving at 2.5 knots, its nets down already for six to seven hours, has highly restricted maneuverability. The Court cannot conclude that any evasive actions–once Si Do was convinced that the WHITNEY was not turning–would have avoided or mitigated the collision.[8]

### ii. Conclusions of Law

Thu Van Nguyen and G&M Marine argue that the WHITNEY was fully at fault for the collision, and should bear the full cost of the damages. MNM, perhaps recognizing that a burdened vessel with a sleeping captain is unlikely to avoid some share of liability, argues that the DUSTIN was also at fault for the accident, and that the damages should be apportioned equally.

Since 1873, Courts sitting in admiralty have applied the *Pennsylvania* rule to vessels violating a statutory rule of navigation. "This rule provides that when a ship violates a statutory rule

---

[7] At trial, Nguyen's cousel asked Anselmi, "At two hours before the collision, how far do you think the Master DUSTIN was away from the point of impact?" to which Anselmi responded "23 miles." This estimate is contrary to the balance of the evidence; however, if Anselmi misunderstood the question and meant that the *WHITNEY* was 23 miles from impact, this estimate is consistent with the testimony that the WHITNEY was traveling at 11knots.

[8] Indeed, there is some suggestion that the DUSTIN must have swerved to port in the last seconds, or the vessels would have hit port to port if the trajectories on the course plotter were accurate. (Rec. Doc. 156 at 8-9). This is corroborated by Ba Nguyen's testimony that at the time of the collision the DUSTIN was headed east, (Exh. 16 at 7) not southeast as depicted on the course recorder. However, without any direct evidence to support this theory, the Court declines to make such a finding.

of navigation intended to prevent collisions, 'the burden rests on the ship of showing not merely that the fault might not have been on of the causes, or that it probably was not, but that it could not have been.'" *Otto Candies, Inc. v. M/V Madeline D*, 721 F.2d 1034, 1036 (5th Cir. 1983) (quoting *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136 (1873)).

"Where both parties to a collision are guilty of statutory fault, the heavy presumption that the fault of each contributed to the accident may be rebutted by proof that, in fact, the fault of either of the parties was the sole cause of the accident or, instead, not a substantial contributing cause thereof." *Otto Candies, Inc. v. M/V Madeline D*, 721 F.2d 1034, 1036 (5th Cir. 1983). If neither party is exonerated, the Court must determine the proportionate degree of fault of both parties. *Id.* (citing *Florida East Coast Railway Company v. Revilo Corporation*, 637 F.2d 1060, 1067 (5th Cir. 1957)); *see United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975) (adopting proportional fault theory of liability).

Here, each vessel's interests allege that the other vessel was in violation of multiple navigational statutes. All parties agree that United States Coast Guard Navigational Rules apply.[9]

---

[9] None of the parties clearly addresses whether they think the Inland Navigational Rules ("INRs"), 33 U.S.C. s. 2001 *et seq.* or the International Regulations for Preventing Collisions ("COLREGs") 33 U.S.C. s. 1602 *et seq.* apply. For example, in G&M's pretrial brief they assert that the "International Navigational" rules apply, but cite to the INRs. (Rec. Doc. 118 at 13). The INRs apply if the incident occurred within United States territorial seas. According to Robert Badeaux's expert report, the incident occurred near N 29° 21' 67", W 92° 47' 05", Badeaux Rep. at 2, which, according to the Court's calculations, is within the demarcation line propagated in 33 C.F.R. 80, and the inland rules should apply. Regardless, the Coast Guard acknowledges that with the exception of Annex V to the Inland Rules, "the International and Inland Rules . . . are very similar in both content and format." United States Coast Guard, *International and Inland Navigation Rules*, http://www.navcen.uscg.gov/mwv/navrules/intlinland.htm (last visited Oct. 21, 2009). Because the parties primarily cite to the Inland Navigation Rules ("INRs") in their briefs, the Court will follow suit to avoid confusion.

None of the parties disputes that per Rule 3 ("Definitions"), the WHITNEY is a "power-driven vessel" and the DUSTIN is a "vessel engaged in fishing."

The parties allege violations of Rules 2, 5, 8, 16, 17, and 18. These Rules are set forth below.

Responsibility (Rule 2)

(a) Exoneration
Nothing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

(b) Departure from rules when necessary to avoid immediate danger
In construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger.

Look-out (Rule 5)
Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.

Action to avoid collision (Rule 8)
(a) General characteristics of action taken to avoid collision
Any action taken to avoid collision shall, if the circumstances of the case admit, be positive, made in ample time and with due regard to the observance of good seamanship.

(b) Readily apparent alterations in course or speed
Any alteration of course or speed to avoid collision shall, if the circumstances of the case admit, be large enough to be readily apparent to another vessel observing visually or by radar; a succession of small alterations of course or speed should be avoided. . . .

(f) Early action to allow room for safe passage
(i) A vessel which, by any of these Rules, is required not to impede the passage or safe passage of another vessel shall, when required by the circumstances of the case, take early action to allow sufficient sea room for the safe passage of the other vessel.
(ii) A vessel required not to impede the passage or safe passage of another vessel is not relieved of this obligation if approaching the other vessel so as to involve risk of collision and shall, when taking action, have full regard to the action which may be required by the Rules of this part.

(iii) A vessel the passage of which is not to be impeded remains fully obliged to comply with the Rules of this part when the two vessels are approaching one another so as to involve risk of collision.

## Action by give-way vessel (Rule 16)

Every vessel which is directed to keep out of the way of another vessel shall, so far as possible, take early and substantial action to keep well clear.

## Action by stand-on vessel (Rule 17)

(a) Stand-on vessel to keep course and speed; action allowed when give-way vessel fails to take appropriate action

(i) Where one of two vessels is to keep out of the way, the other shall keep her course and speed.

(ii) The latter vessel may, however, take action to avoid collision by her maneuver alone, as soon as it becomes apparent to her that the vessel required to keep out of the way is not taking appropriate action in compliance with these Rules.

(b) Action by stand-on vessel allowed when action by give-way vessel alone cannot avoid collision

When, from any cause, the vessel required to keep her course and speed finds herself so close that collision cannot be avoided by the action of the give-way vessel alone, she shall take such action as will best aid to avoid collision.

(c) Crossing situations

A power-driven vessel which takes action in a crossing situation in accordance with subparagraph (a)(ii) of this Rule to avoid collision with another power-driven vessel shall, if the circumstances of the case admit, not alter course to port for a vessel on her own port side.

(d) Give-way vessel not relieved of obligation to keep out of the way

This Rule does not relieve the give-way vessel of her obligation to keep out of the way.

## Responsibilities between vessels (Rule 18)

Except where Rules 9, 10, and 13 otherwise require:

(a) Power-driven vessels underway

A power-driven vessel underway shall keep out of the way of:

(i) a vessel not under command;

(ii) a vessel restricted in her ability to maneuver;

(iii) a vessel engaged in fishing; and

(iv) a sailing vessel. . . .

(c) Vessels engaged in fishing when underway

A vessel engaged in fishing when underway shall, so far as possible, keep out of the way of:

(i) a vessel not under command; and

(ii) a vessel restricted in her ability to maneuver.

MNM concedes that the WHITNEY violated INRs 2, 5, 8, and 16. (Rec. Doc. 158 at 2). It is not disputed that Kent failed to maintain a proper lookout on the WHITNEY. (Rec. Doc. 155 at 25). When the collision occurred, AB Reyes was "making rounds" and not in the wheelhouse. (Kent Deposition at 61-65). It was conceded that Kent fell asleep at some point when he was less than ten minutes from the DUSTIN, waking up literally only seconds before impact. Further, the WHITNEY was undoubtedly the burdened vessel, and was required to take early and substantial action to avoid the collision per INRs 8 and 16. However, Kent varied his course by only three degrees each time. The second time, he was less than ten minutes away from the DUSTIN. Given the speeds and courses of each vessel, these adjustments do not constitute "substantial action."[10] Indeed, the Court suggests that a prudent captain would not only have made a more substantial course alteration, but would have taken the vessel off of autopilot altogether, especially since he acknowledged that the DUSTIN had the right of way. *Id.* at 161. And clearly even a tired captain would have made every effort to stay awake or else give the wheel to another hand to assure safe passage past the DUSTIN.

However, MNM argues that the DUSTIN also violated INRs 2, 5, 8, and 17. (Rec. Doc. 158 at 3). MNM points to the fact that the DUSTIN, the stand on vehicle, was not "maintain[ing] its course and speed" per Rule 17(a) and that once it was clear that the WHITNEY was not adequately altering its course to avoid the collision, the DUSTIN failed to take action to avoid the collision in violation of Rule 2. MNM also argues that the DUSTIN violated Rule 5's look-out requirement. Finally, MNM argues that the DUSTIN violated Rule 8 by failing to take positive action in ample

---

[10] MNM expert Anselmi testified that a three degree course change is "not large enough" to be readily apparent to another vessel. G&M expert Robert Badeaux testified that "three degrees is not an ample course change."

time to avoid the collision.  (Rec. Doc. 155 at 24-28).  G&M and Thu Van Nguyen deny that the DUSTIN violated any of these rules.  (Rec Doc. 156 at 4; Rec. Doc. 154 at 40).

G&M and Thu Van Nguyen rely primarily on a Fifth Circuit decision from 1957, *Bloomfield Steamship Company v. Brownsville Shrimp Exchange*, 243 F.2d 869 (5th Cir. 1957).  There, on a clear night a steamship proceeded at full speed towards a shrimp trawling armada, failing to recognize until too late that the vessels were trawling and not anchored.  *Id.* at 871.  At approximately two minutes before the collision, the shrimping vessel recognized that the steamship was not going to adequately change course, and attempted evasive maneuvers, but was unable to escape the steamship's path.  *Id.* at 871.  On appeal of the district court's decision assigning the entirety of the fault to the steamship, the steamship argued that its fault should be reduced in light of the shrimping vessel's several minor course changes preceding the collision and for failure to post adequate lookouts.  The Fifth Circuit, affirming the district court's ruling, held that "a dozen lookouts posted fore, aft, and amidships, on deck, in the pilot house, or perched mast high would not have told [the shrimper] more than she already knew: that an ocean-going vessel was coming straight on."  *Id.* at 872.  The court further affirmed that the course changes were reasonable and not the cause of the collision.  *Id.* at 872-73.

Thu Van Nguyen additionally argues that per the Seafarer's Training, Certification, and Watchkeeping Code, section A-VIII/2, 46 C.F.R. § 15.103, fishing vessels need not have a lookout besides the pilot.  (Rec. Doc. 156 at 10).

Other courts examining similar factual circumstances have also held the burdened vessel primarily at fault.  In *Fitzgerald v Merryman*, 865 F.Supp. 9 (D. Me. 1994), a Maine lobsterman was pulling in his lobster traps when he looked up to find the defendant vessel sixty feet away and

approaching at a speed of 12 to 15 knots. *Id.* at 10. The court found that the lobsterman did violate INR 5, the look-out rule, by failing to maintain an adequate lookout, noting that "[h]ad he seen Defendant's boat earlier, Plaintiff might have been able to avoid the collision." *Id.* at 12. The court also found that the lobsterman did not violate any other rules: "As the privileged vessel, he was required to maintain his course and speed. While INR 17 also requires that he take 'such action as will best avoid a collision,' no evidence was presented that any such action was feasible at the time Plaintiff saw [Defendant's vessel]. . . . Plaintiff's maneuverability was greatly restricted and, given that approximately three seconds lapsed between Plaintiff's first observation of the [vessel] and impact, there is nothing more Plaintiff could have done to prevent the accident." *Id.* The court found the defendant 95% at fault. *Id.*

In contrast, MNM cites two decisions from courts in other circuits that held that a privileged vessel that fails to maintain a proper lookout should be held equally liable for an accident, its privileged status notwithstanding. (Rec. Doc. 158 at 7-8). In *Lentz v. Eastern Grace*, 1988 WL 135809 (D. Or. Dec. 2, 1988) a fishing vessel was drifting at night while its crew slept, and collided with a merchant vessel. *Id.* at *1. Neither vessel had a lookout. *Id.* The court held that "[b]oth vessels caused the collision, which could have been avoided had either one been maintaining a proper lookout. The *cause of the accident* was not a failure to give way or to properly maneuver. If either vessel had sighted the other vessel, as each could have done . . . either vessel could have, and presumably would have, properly maneuvered or given way so as to avoid the collision." *Id.* at *3 (emphasis in original). Similarly, in *Granholm v. TFL Express*, 576 F.Supp. 435 (S.D.N.Y. 1983), a sailing yacht whose captain was asleep below deck at night was struck by a merchant vessel that failed to see the yacht's navigation lights. *Id.* at 349, 448. The court found that "the failure to

maintain any lookout at all at night . . . is sufficient to overcome any advantage which [the sailboat] might other wise enjoy as (1) an overtaken vessel which (2) was under sail" and apportioned fault equally. *Id.* at 450.

The Court finds the instant case most similar to the case of *Bloomfield Steamship Company* 243 F.2d 869. Here, as there, the shrimping vessel did not realize until moments before the collision that the oncoming burdened vessel did not intend a course correction. The Court cannot find an INR violation on the part of the DUSTIN. Absent any affirmative evidence regarding Si Do's actions, the Court cannot speculate that he failed to maintain an adequate lookout or that he failed to attempt evasive maneuvers.[11] Further, the Court holds that the DUSTIN's lengthy turn from north to south in the hours before the collision was consistent with the "maintain course and speed" requirement of INR 17. In *Pinto v. M/S/Fernwood*, 507 F.2d 1327, 1331 (1st Cir. 1974), the First Circuit addressed the question of whether a privileged fishing vessel, obliged to maintain its course and speed, is permitted to making navigational course changes consistent with its fishing practice. The court there held it was. "The privileged vessel also maintains course and speed as required by [INR 17] notwithstanding changes in both course and speed so long as the changes are predictable." *Id.* (quoting *United States v. S. S. Soya Atlantic*, 330 F.2d 732 (4th Cir. 1964)). This is consistent with the testimony of Robert Badeaux, who testified that when another vessel is in the area, a fishing vessel can continue to "follow[] his fishing pattern."

Further, even if Si Do had seen the WHITNEY, which the Court cannot determine, he was

---

[11]  MNM alleges "virtually a complete absence of testimony of the pre-collision activities aboard the DUSTIN." (Rec. Doc.155 at 2). The Court agrees, but declines to draw the speculative adverse inferences that MNM asserts. The Court cannot presume statutory violations without supportive evidence.

14

obliged to maintain his course and speed until it was apparent that the WHITNEY was not going to abide by its statutory obligations. INR 17. However, a shrimping vessel with its nets down has very limited mobility, and therefore this window of opportunity was quite narrow. (Testimony of Robert Badeaux).

The Court holds that the DUSTIN has successfully rebutted any presumption that it was at fault. The weight of the evidence indicates that the WHITNEY had the greater responsibility and opportunity to take early and effective measures to avoid the collision. As such, the WHITNEY will be responsible for all of the consequential damages sustained by the DUSTIN.

*C. Damages*

    i. Findings of Fact

        a. G&M's Collision Repair Claims

Immediately following the collision, the DUSTIN returned to its home port of Port Arthur, Texas. While the DUSTIN was in Texas, G&M solicited a damage survey from marine surveyors Diers and Associates. Diers employee Thor Jones completed an initial survey on January 23, 2007, and estimated the repairs at $85,000, not including any underwater damage. He indicated that dry docking and gas freeing would be necessary to complete the inspection and repairs. (Exh. 33 at 9). On January 31, 2007, a follow-up joint survey was completed by Jones and Peter Kolp of Sabine Surveyors, Ltd., who attended on behalf of the WHITNEY's interests. (Exh. 33 at 22). The joint survey report includes largely the same information, but omits the $85,000 estimate. The joint survey also reiterated the need for dry-docking, but concluded that gas-freeing would not be necessary. (Exh. 33 at 5). The joint survey submitted to the Court was signed by Jones, but not Kolp. *Id.*

In February, 2007, the DUSTIN was taken to Bayou LaBatre, Alabama, for dry-docking.[12] On February 15, 2007, while the DUSTIN was dry-docked at Jemison Marine, a second joint survey was completed. Chris Collier of C.E. Collier and Associates, Inc., attended for the DUSTIN's interests, and Matthew Kapp of Sabine Surveyors for the WHITNEY's. (Exh. 34 at 1-3). This survey estimated collision repairs at between $90,000 and $100,000. (Exh. 34 at 5).

G&M then solicited bids for repairs. Jemison Marine submitted a bid of $92,824.30 (Exh. 19 at 3), which Chris Collier assessed as reasonable (Exh. 34 at 7). William Courtenay, G&M's claims analyst testified that G&M was informed that an additional $7,000 would be needed to repair the decking and engine, bringing the total collision cost to $99,824.30. After subtracting the $10,000 policy deductible, (Exh. 5 at 16) G&M determined that it owed the DUSTIN's interests $89,824.30 for insured collision related repairs. On July 11, 2007, G&M Marine paid the Business Loan Center, the DUSTIN's first mortgagee, $89,824.30 in satisfaction of the insurance claims, (Exh. 31) and seeks this amount as collision related repairs. It also seeks the costs of the surveys, $5,767, and the associated investigation and translation. (Exh. 32).

While the DUSTIN was dry-docked in Alabama, Thu Van Nguyen and G&M were engaged in a dispute over the insurance claim, and it initially appeared that G&M intended to deny the claim. (Testimony of William Courtenay). Due to this dispute, Thu Van Nguyen opted not to get the collision repairs done at Jemison, and instead brought the vessel back from Alabama to get repaired at Brother Marine, in Port Arthur, Texas. (Exh. 34 at 7: "The assured however, stopped the collision

---

[12] Thu Van Nguyen testified that he attempted to find an available dry-docking facility in Texas but was unable to do so. MNM argues that Thu Van Nguyen himself did not make the calls, and therefore his testimony is not credible. However, the Court finds credible the assertion that Nguyen's interests attempted to find more proximate dry-docks.

repairs after apparently being advised that the claim would not be honored due to a breach of warranty.") Although work totaling $27,641.00 was completed at Jemison Marine, (Exh. 19 at 2) this was only "bottom" repair work that was not collision related. (Testimony of Thu Van Nguyen). Thu Van Nguyen testified that Jemison's bid to fix the "top" of the boat was too expensive. Thu Van Nguyen then brought the DUSTIN back to Port Arthur and contracted with Brother Marine for top side, collision-related repairs. Brother Marine billed Thu Van Nguyen $72,900 for these repairs in April 2007. (Exh. 20).

Thu Van Nguyen also submitted into evidence checks showing payment by Thu Van Nguyen to Jemison Marine in the amounts of $5,000.00 and $8,141.00, and payment by Business Loan Center, the DUSTIN's mortgagee, in the amount of $14,155.00, for a total payment to Jemison Marine of $27,296.00. (Exh. 19 at 4-7). It is not clear to the Court why this number differs from the Jemison invoice for services provided at $27,641. (Exh. 19 at 2). Regardless, the Collier report indicates that "none of the collision repairs were accomplished while at [Jemison]. . . . Only such work in order to refloat the vessel was accomplished, none of which was claim related, with the exception of hauling costs and gas freeing of the starboard forward wing fuel tank which was accomplished in order to perform the collision repairs." (Exh. 34 at 6). The Jemison invoice does not indicate which of the repairs performed by Jemison Marine correspond to the collision related expenses listed in the Collier report. (Exh. 19 at 2). However, based on the Collier report's minimal itemization, the Court finds the following items on the Jemison invoice to be Collision related: "Haul Out, $1000; Block, $441; Degasing tank, $2,650; Unblock & launch, $294," (Exh. 19 at 2) for a total of $4,385.00 of collision repair work at Jemison Marine. The invoice does not divide labor costs among the tasks performed, and the Court declines to estimate the man hours dedicated

to the above listed tasks. Therefore the Court finds that $4,385.00 of the work performed at Jemison Marine was collision related.

### b. Thu Van Nguyen's Claims

#### 1. Collision Repairs

In Thu Van Ngyuen's post trial reply to MNM's proposed findings of fact, he states that the collision related damages "include[] some of the work conducted at Jemison Marine for the inspection, the work conducted at Brother Marine for the hull and outriggers, the work conducted by L&P Marine for the nets and rigging, the work conducted by K&B Marine for the engine shaft, and the work conducted by Thu Van Nguyen's brother to switch out the autopilot." (Rec. Doc. 159 at 11). Thu Van Nguyen does not seek to recover the full cost of the collision repair at Brother Marine. Rather, he asks the Court to award damages for the $10,000 insurance deductible, the cost of the replacement nets from L&P Marine, and the cost of replacing the damaged electronic autopilot. He does not claim the engine repair work, which Rose Nguyen testified was paid for by "the bank."

The invoice from Brother Marine is sparse in detail (Exh. 20), but Rose Nguyen, who handles her husband Thu Van Nguyen's finances, testified at trial that the $10,000 deductible on the insurance policy was paid in cash to Brother Marine, with the balance paid by "the bank." The Court finds her testimony credible.

Thu Van Nguyen has supplied bills totaling $61,267 from L&P Marine for replacement nets and rigging. (Exh. 45 at 2-4). MNM argues that Ba Nguyen's cutting of the nets after the collision was unreasonable, as the nets could have been "buoyed." Thu Van Nguyen testified that he spoke with Ba Nguyen in the moments immediately following the collision, and that Ba asked to cut the

nets because the DUSTIN was in danger of capsizing.[13]  Although buoying the nets may have been wiser in hindsight, the Court declines to play armchair admiral: it was reasonable under the circumstances for Thu Van Nguyen to opt to cut the nets to ensure that the safety of his boat and crew.  The cost of replacement nets is therefore recoverable.

Thu Van Nguyen also alleges that the DUSTIN's autopilot was damaged in the collision, and needed to be replaced with a functioning autopilot.  Rose Nguyen testified that the work was completed by Thu Van Nguyen's brother using a spare autopilot from a different boat.  Thu Van Nguyen submitted into evidence an estimate from New World Electronics indicating that a replacement would cost $5,750.  (Exh. 21).

Finally, Thu Van Nguyen argues that he is entitled to compensation for the cost of transporting the DUSTIN from Texas to Alabama for dry-docking.  Thu Van Nguyen again cannot provide receipts, but provided an estimate of the costs as an exhibit, with a total of $9,120.  (Exh. 19 at 4).  Of this, $3,600 is fuel cost; $3,000 is "Captain"; $2,400 is allotted for "Deckhands"; and $150 for Groceries.  *Id.*  Thu Van Nguyen testified that he hired three crew members to transport the boat to Alabama and back.  The Court finds that the daily winter earnings for the crew of the DUSTIN when shrimping are approximately $1,400 per day for a crew a of three.[14]  A recovery of

---

[13]  This testimony is admitted over MNM's hearsay objection under FRE 803(2) (excited utterance).  Ba Nguyen's statement to the G&M investigator corroborates this assertion.  (Exh. 16 at 8).

[14]  As discussed *infra*, the Court adopts a variation of the model proposed by Thu Van Nguyen for calculating earnings, taking into account MNM's criticisms of Thu Van Nguyen's number.  Namely, the Court is not including in its calculations the earnings for the catch brought in on January 9, 2006, listed on Exhibit 25 page 2, as this appears to be an abnormally high "bumper" catch.  In addition, no fuel costs were listed as associated with that catch.  Therefore, the Court subtracted $54,288.80 from the January 9- May 12 Catch listed in Exhibit 47, and used 70 instead of 79 as the number of shrimping days.  However, no fuel costs were deducted, as that

$5,400 for three crew members to take the boat to and from Alabama is therefore reasonable. Adding the cost of fuel and groceries, the total of $9,120 is appropriate.

### 2. Loss of Use

#### Daily Rate

Thu Van Nguyen presents a loss of use (or "detention") claim to recover the profits lost while the DUSTIN was being repaired. MNM contests both the daily rate requested and the number of days claimed.

At trial, the parties presented two alternative theories for calculating the DUSTIN's lost profits. At trial Rose Nguyen testified to the following basic business model, as summarized by Thu Van Nguyen's post trial brief: "The shrimp caught during each trip are sold at the dock, which creates gross revenue. From this revenue fuel, oil, and other variable expenses such as supplies, repairs, and groceries are deducted. After these expenses are deducted, the net income is divided between the crew and the owner, with the crew taking a total of forty-five percent and the owner taking fifty-five percent." (Rec. Doc. 156 at 25).

Both parties agree to this basic expenses/revenues model, but dispute the numbers and date ranges that are appropriate for modeling the amount of earnings lost. Thu Van Nguyen argues that shrimping is a seasonal business, noting that the DUSTIN is a larger shrimp boat capable of shrimping even in rougher winter waters, which gives it a competitive advantage. (Rec. Doc. 159 at 13). Therefore he argues that the appropriate calculation involves determining the amount earned by the DUSTIN per shrimping day in January through May of 2006, converting that to a per 2006 calendar day estimate, and then multiplying that number by the number of days the DUSTIN was

---

number already accurately reflects the fuel used on the dates listed.

out of service due to the collision in 2007 for the total recovery.[15]  (Exh. 47; Rec. Doc. 156 at 25). He calculates an average loss of $769.47 per calendar day, for a total claim of $82,333.29.  (Rec. Doc. 159 at 13).

MNM argues that an annual "per shrimping day" calculation is more appropriate, and further suggests that the 2007 catch was lower than the 2006 catch across the board, and any calculation of lost profits should be reduced commensurately.  (Rec. Doc. 155 at 20-21).  MNM's calculations yield a per shrimping day loss of $352.25.[16]  MNM also argues that even under a seasonal model, Thu Van Nguyen's calculations fail to deduct appropriate oil and fuel costs and do not use an appropriate number of "shrimping days" as a denominator.  (Rec. Doc. 158 at 21).

The Court finds that shrimping is a seasonal business, and that the winter months of 2006 are the most appropriate predictor of the DUSTIN's loss.  The Court also agrees with MNM's criticisms of Thu Van Nguyen's calculations, and finds that $549 per calendar day fairly reflects the DUSTIN's likely winter earnings.[17]  (Exh. 25, 47).

*Days Out of Service Attributable to the Collision*

The collision occurred on January 20, 2007, and the DUSTIN returned to shrimping on May 7, 2007.  (Exh. 22 at 4).  Thu Van Nguyen seeks compensation for 107 calendar days of lost profit.

---

[15]  "Shrimping days" are days the boat was actually on the water, as opposed to "calendar days" over the entire time period at issue.  This distinction is necessary because it is impossible to predict how many days the DUSTIN would actually have shrimped during the time it was out of service due to the collision.  Therefore, the fairest calculation involves determining an amount earned per calendar day of the chosen representative sample–in this case, winter 2006–and using that to calculate fair compensation for the calendar days out of use attributable to the collision.

[16]  MNM also contests the number of days claimed, discussed *infra.*

[17]  See footnote 14, *supra*, for an explanation of the numbers used by the Court to arrive at this number.

MNM argues that a dispute about insurance coverage between G&M and Thu Van Nguyen extended the number of days the DUSTIN was out of service and that those days should be excluded from any detention claim. (Rec. Doc. 155 at 18-19). MNM concedes only 17 days of loss of use as collision related. *Id.*

The Court finds that Thu Van Nguyen's actions were reasonable under the circumstances. The dry-docking of the DUSTIN in Bayou LaBatre was a necessary step in finalizing the insurance claim with G&M. (Testimony of Thu Van Nguyen). Although G&M did not approve payment on the claim for the DUSTIN until May, Thu Van Nguyen made the decision to bring the boat back to Port Arthur to be repaired at Brother Marine–for substantially less than the Jemison bid–sometime in April. Disputes between claimants and insurers over the recoverable repairs are common and to be expected. MNM has presented no evidence that Thu Van Nguyen's decisions were imprudent under the circumstances. Further, it is logically inconsistent for MNM to argue both that the Jemison Marine bid was unreasonably high and that Thu Van Nguyen cannot recover for the delay caused by bringing the DUSTIN back to Port Arthur to be repaired. If the bid was unreasonably high, then it was reasonable for Thu Van Nguyen to bring the DUSTIN back to Port Arthur to be repaired.

Nonetheless, it is apparent that the majority of the time the DUSTIN spent in Bayou LaBatre was for owner's repairs. The exact amount of time is not evident from the record. The Court finds that February 20 through 28, 2007, cannot be attributed to the collision, and deducts nine calendar days from the loss of use calculation. (*See* Exh. 19 at 2). However, the Court finds the balance of the claimed days reasonable under the circumstances, and awards Thu Van Nguyen damages for 98 calendar days.

ii. Conclusions of Law

A vessel owner is entitled to recover the cost of reasonable necessary repairs to its vessel from the vessel owner at fault in a collision. *Marathon Pipe Line Co. v. Drilling Rig ROWAN/ODESSA*, 761 F.2d 229, 233 (5th Cir. 1985). The fact that a plaintiff is unable to prove the extent of his damages with certainty does not bar recovery. *Daniels Towing Service, Inc. v. Nat Harrison Associates, Inc.*, 432 F.2d 103, 104 (5th Cir.1970). "[W]here [the] exact loss is unascertainable, a just and reasonable estimate of the damage based on relevant data may be made and the verdict rendered accordingly." *Id.* at 106. Where damages caused by a defendant are proven, the defendant has the burden of segregating out damages not caused by him which would tend to reduce his liability. *Id.*

Nevertheless, the burden of proof remains with the plaintiff to "establish by a preponderance of the evidence that the [defendants' action] caused the damage . . . which is the subject of this litigation." *Texas Eastern Transmission Corp. v. Garber Brothers, Inc.*, 494 F.Supp. 832, 834 (E.D.La.1980), *aff'd in pertinent part without op.*, 677 F.2d 114 (5th Cir. 1982). In addition, defendants cannot be liable for damages they did not cause, or for the cost of repairs that enhance the value of the damaged property compared to its pre-tort condition. *Pizani v. M/V COTTON BLOSSOM*, 669 F.2d 1084, 1088 (5th Cir.1982).

The burden of establishing lost profits is upon the ship owner who has lost the use of his vessel. *Ove Skou v. United States*, 478 F.2d 343, 346 (5th Cir. 1973). Lost profits will only be allowed when profits have actually been, or may reasonably suppose to have been lost, and the amount of such profits is proved with reasonable certainty. *The Conqueror*, 166 U.S. 110, 115 (1898). The general measure of economic loss of a vessel during detention is net profit.

"After a reasonable choice of a repair company is made, further consequences of that choice, such as subsequent damages or delays, flow from the collision. The party whose wrong forced the choice cannot complain of the consequences, with the benefit of hindsight, once a reasonable choice is made." *Marine Office of America Corp. v. M/V Vulcan*, 891 F.Supp. 278, 287 (E.D.La. 1995) (citations omitted).

The Court finds that repair costs for the DUSTIN near $100,000, not including fishing gear and electronics, are reasonable and supported by the evidence. However, the evidence presented also demonstrates that Brother Marine performed all of the insured repairs at a lower cost of $72,900. The Court therefore rejects both the Jemison Marine estimate (Exh. 19) and the settlement between G&M and the Business Loan Center (Exh. 31) as the basis of the amount of collision repairs to the DUSTIN, and instead uses the actual costs of the repairs performed by Brother Marine (Exh. 20) plus the collision related costs at Jemison Marine described above to reach a final repair cost of $77,285. From this the Court subtracts the $10,000 deductible paid by Thu Van Nguyen for a recoverable loss by G&M of $67,285.00.[18]

Necessary travel expenses are recoverable as damages following a maritime collision. *In re M/V Nicole Trahan*, 10 F.3d 1190, 1196 (5th Cir. 1994). Taking the DUSTIN to Bayou LaBatre was reasonable under the circumstances, *see, e.g., Domar Ocean Trans., Ltd., Div of Lee-Vac, Ltd. v. M/V Andrew Martin*, 754 F.2d 616, 619-20 (5th Cir. 1985), and Thu Van Nguyen can recover for the transportation costs.

Recovery for detention damages for time spent on collision repair when owner's non-

_____

[18] The Court acknowledges that this results in a windfall to the Business Loan Center, which received the full $89,824.30 for collision related repairs. However, the cost of G&M's settling for greater than the value of the collision repairs should not be borne by MNM.

collision related repairs are performed simultaneously is contingent on the necessity of both types of work. This principle was originally set out by Judge Learned Hand, who wrote that, "[i]f the owner of a damaged vessel puts her in dry dock to repair damages done by a collision, and while she is there seizes the opportunity to make other repairs, which do not extend the time consumed in the collision repairs, the tort-feasor may not abate his damages." *Clyde S.S. Co. v. City of New York*, 20 F.2d 381, 381 (2nd Cir. 1927). The Second Circuit later clarified that "[i]f the vessel were kept in service following the collision and the repairs were deferred by the owner to the time of the next lay-up, to be done at that time together with owner's work, no detention damages would be allowable for the time commonly attributable to both kinds of repairs," *Bouchard Transportation Co., Inc. v. The Tug "Ocean Prince,"* 691 F.2d 609, 612 (2nd Cir. 1982). However, if the owner takes advantage of an immediately required lay-up to accelerate an annual overhaul, the tort-feasor's obligation is not abated. *Id.* at 613. The Fifth Circuit has adopted Judge Hand's reasoning, noting that the court in *Clyde* held that since "repairs unrelated to the tort-feasor's actions had to be done that season, the owner would have lost the use of the vessel for that period of time regardless of the collision; therefore, he was not entitled to recover damages for the detention." *Johnson v. Otto Candies, Inc.*, 828 F.2d 1114, 1118-19 (5th Cir. 1987) (citing *Clyde*, 20 F.2d at 381).

As discussed above, the Court finds that it was reasonable for Thu Van Nguyen to take the boat to Jemison Marine for dry-docking, as required by his insurer. It was also reasonable to get the DUSTIN repaired at Brother Marine, at a lower cost than the Jemison estimate. The delay incurred between the survey and the decision to take the boat back to Texas while Thu Van Nguyen was awaiting a determination of his insurance claim is a consequence of the collision, and the cost should not be borne by Thu Van Nguyen. The Court therefore finds that majority of the days the DUSTIN

was out of service are attributable to the collision, and that the associated lost costs can be recovered. However, because the Court does not have the benefit of a precise timeline establishing the insurance and repair decision making process, it cannot determine whether the owners repairs done at Jemison Marine unnecessarily extended the DUSTIN's stay in Alabama. The Court therefore deducts those nine days from the DUSTIN's time out of service, for a total of 98 compensable days.

Thu Van Nguyen also seeks to recover for the replaced electronic autopilot. "[T]here is no doubt that the owner of a vessel may recover as damages an amount necessary to restore her to her condition before the accident, whether the repairs are actually made or not, if the value of the vessel is thereby decreased." *City of Miami v. Western Shipping & Trade Co.*, 232 F.2d 847, 851 (5th Cir. 1956). Because the Court finds that the autopilot was damaged, Thu Van Nguyen is entitled to recover damages for the replacement value of the autopilot, $5,750.

G&M argues that it is entitled to compensation for the costs of the surveys and of investigating the claim, including the cost of Vietnamese translators. (Rec. Doc 154 at 51, Exh. 32) and seeks repayment for their settlements with Si Do and Ly Le. (Rec. Doc. 154 at 50).

G&M's claim for survey costs is an allowable expense. *Marine Office*, 891 F.Supp. at 289 ("Recoverable costs include surveyors, port captains who protect the vessel and oversee repairs, and general expenses."). However, the investigation costs and translation costs are not recoverable. *The Venus*, 17 F. 925 (S.D.N.Y. 1883) (costs solely for the benefit of the insurer not recoverable); *see also Zanzibar Shipping, S. A. v. Railroad Locomotive Engine Number 2199*, 533 F.Supp. 392, 398 (D.C.Tex. 1982) (disallowing survey expenses not related to damage assessment).

G&M cannot recover from MNM any sums paid in settlement of personal injury claims

asserted against Thu Van Nguyen and the DUSTIN. G&M's claims manager testified G&M did not obtain the release of MNM in connection with Si Do and Ly Le claims. Maritime law is clear that a settling defendant who obtains the release of the liability of a non-settling defendant may file a contribution claim against the released, but non-settling party, but a settling defendant who has not obtained a release of the liability of the non-settling party may not file a contribution claim against that party. *See Murphy v. Florida Keys Electric Cooperative Association, Inc.*, 329 F.2d 1311, 1315 (11th Cir. 2003); *McDermott, Inc. v. AmClyde*, 511 U.S. 202 (1994). In this case Thu Van Nguyen and G&M obtained their own release as regard claims asserted by Si Do (Exh. 27) and Ly Le (Exh. 17) but did not obtain the release of MNM. Therefore, G&M has no claim for contribution against MNM in connection with the settlement of the personal injury claims asserted by Si Do and Ly Le.

Finally, pre-judgment interest is a general, but not automatic, rule in maritime cases. *City of Milwaukee v. Cement Division, National Gypsum Co.*, 515 U.S. 189 (1995). In the instant case the Court finds Thu Van Nguyen and G&M entitled to pre-judgment interest on their claims.

## D. *G&M's Subrogation Claims as to Business Loan Center*

MNM argues that G&M is an improper party to recover in this matter, because their subrogation of Business Loan Center's rights puts them in the shoes of the mortgagee, which does not have a cause of action against a third-party tortfeasor. (Rec. Doc. 155 at 33).

In real property law, a mortgagee can maintain a cause of action against a third party to the extent of the damages to its security. *See* CJS Mortgages § 389; *see also Allstate Finance Corp. v. Zimmerman*, 272 F.2d 323, 325-26 (5th Cir. 1959) ("In Florida, and generally elsewhere . . . the right of action by the mortgagee whatever it may be, or the nature of the action, is only for the

recovery of an amount not exceeding the mortgage debt."). This same principle applies in admiralty. *The Grand Republic*, 10 F. 398 (S.D.N.Y. 1882) ("A mortgagee at common law can maintain an action of trespass, or of trespass upon the case, for any injury to his interest as mortgagee, and whenever such an injury arises through a marine tort, he has, therefore, upon the general principles of admiralty jurisdiction, a right to relief in this court." (Internal citation omitted)); *see* CJS Admiralty § 139 (2009).

In this case, the Business Loan Center's insured interest was affected. G&M and Thu Van Nguyen have submitted evidence that the Business Loan Center did not retain the settlement funds with G&M to pay off the mortgage, as suggested by MNM (Rec. Doc. 158 at 18), but paid both Jemison Marine and Brother Marine for repairs to the DUSTIN. (Exh. 19 at 6; Testimony of Rose Nguyen). The Business Loan Center therefore had claims against MNM, and G&M, as subrogee, can recover based on those claims.

Accordingly,

IT IS ORDERED that:

MNM make payment to Thu Van Nguyen for (1) 98 days of detention damages at a daily rate of $549.00, for a total detention loss of $53,802.00; (2) the $10,000 insurance deductible; (3) $61,267 for replacement nets and rigging; (4) $5,750 for a replacement autopilot; and (5) $9,120 for transportation costs for a total payment of $139,939.00.

MNM make payment to G&M for (1) $67,285 for insured repairs and (2) $5,767 for the surveys for a total payment of $73,052.00.

IT IS FURTHER ORDERED that MNM pay pre-judgment interest on the above damages

at the rate established by 28 U.S.C. § 1961.

New Orleans, Louisiana, this 4th day of December, 2009.

**HELEN G. BERRIGAN**
**UNITED STATES DISTRICT JUDGE**